## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **HASSAN MOHAMMADI and** | * |
| **YASAMAN ROWHANI,** | * |
| 2142 Cathedral Ave, N.W. | * |
| Washington, DC 20008 | * |
| | * |
| **Plaintiffs,** | * |
| | * |
| **VS.** | * |
| | * |
| **JOSEPH MICHAEL** | * |
| 9104 Mapleville Rd. | * |
| Boonsboro, MD 21713-1828 | * |
| Washington County, MD | * |
| Deputy State's Attorney for | * |
| Washington County, Maryland, | * |
| in his personal capacity. | * |
| | * |
| **SERVE ON:** | * |
| **STATE OF MARYLAND** | *       **Civil Action No.** |
| via its agency, the State's Attorney's | * |
| Office for Washington County, Maryland | * |
| Office of State's Attorney | * |
| County Office Building, Room 302 | * |
| 33 West Washington St. | * |
| Hagerstown, MD 21740-4879 | * |
| And via, | * |
| Nancy K. Kopp, Treasurer | * |
| GOLDSTEIN TREASURY BUILDING | * |
| 80 Calvert St. | * |
| Annapolis, MD 21401 | * |
| | * |
| and | * |
| | * |
| **CRISTINA O'BRIEN** | * |
| 434 Leaning Oak St. | * |
| Gaithersburg, MD 20878 | * |
| Montgomery County, MD | * |
| United States Department of Labor | * |
| (Employment Benefits Services Division) | * |
| in her personal capacity, | * |
| | * |

and                                              *
                                                 *
**COLLEEN McKEE**                                *
13502 Justice Rd.                                *
Rockville, MD  20853                             *
Montgomery County, MD                            *
Investigator,                                    *
United States Department of Labor                *
(Employment Benefit Services Division)           *
in her personal capacity,                        *
                                                 *
and                                              *
                                                 *
**DAVID FINIZIE,**                               *
709 Foxcroft Dr.                                 *
Riverton, NJ  08077                              *
Regional Criminal Coordinator,                   *
United States Department of Labor                *
(Employment Benefit Services Division)           *
in his personal capacity,                        *
                                                 *
    **SERVE ON:**            *
    **Rod J. Rosenstein**     *
    **U.S. Attorney for the** *
    **District of Maryland**  *
    36 South Charles St.      *
    Baltimore, MD 21201       *
                                                 *
    **Eric Holder**           *
    **U.S. ATTORNEY GENERAL** *
    **U.S. Department of Justice** *
    950 Pennsylvania Avenue, N.W. *
    Washington, DC 20530-0001 *
                                                 *
    **Defendants.**           *
                                                 *
**************************************************************

## PLAINTIFFS FIRST AMENDED COMPLAINT

Plaintiffs Hassan Mohammadi and Yasaman Rowhani, by counsel, hereby bring this Complaint

against Defendants Cristina O'Brien, David Finizie and Colleen McKee, employees of the United States

2

Department of Labor ("DOL Defendants"), in their personal capacities; and the Deputy State's Attorney

for Washington County, Joseph Michael in his personal capacity for civil rights violations perpetrated

knowingly, maliciously and recklessly against Plaintiffs under the Fourth and Fourteenth Amendments to

the United States Constitution; and in violation of 42 U.S. Code § 1983.

## PRELIMINARY STATEMENT

This Complaint seeks redress for injuries caused by public officials, namely the Deputy State's

Attorney for Washington County, Maryland.  The State's Attorney Defendant herein named is not legally

immune from these claims under Maryland law because the wrongful acts of which each he is accused

were committed with malice, gross negligence and improper purpose.  *Lee v. Cline*, 384 Md. 245 (2004).

## NATURE OF CASE

1.      This case is about the unconstitutional arrest, incarceration and trial of Plaintiffs Hassan

Mohammadi and Yasaman Rowhani.  Plaintiffs are United States citizens.  Plaintiffs are married and have

two children.  Plaintiffs have lived in the same home in Washington D.C. for approximately twenty-eight

years.  Although Plaintiffs are United States citizens and lived in Washington, D.C. for most of their lives,

Plaintiffs were singled out for prosecution because they are of Iranian descent and were outsiders in a

community where their conviction would be presumably easy.  Defendants brought this malicious action

against Plaintiffs without evidence of any crime being committed.  Defendants all had their own individual

agendas, but they essentially all sought personal notoriety and career advancement associated with the

novel idea of bringing a state criminal claim for theft of employee benefits.  The individual Defendants

engaged in these malicious and reckless conduct with the joint participation of the DOL and the Maryland

State's Attorney's Office.  Unfortunately for Plaintiffs, Defendants paid no heed to whether any crime

actually had been committed or to the fact that there was absolutely no evidence of theft against Plaintiffs whatsoever.

2.      Plaintiffs were supervisory employees at the Hagerstown Hotel and Convention Center ("Hotel") in Hagerstown, Maryland, which was owned by Watchwood, Inc. ("Watchwood").  Plaintiffs had no ownership interest in the Hotel and were employed by Watchwood.  Beginning in early 2009, the Hotel began to fall behind on its bills including its insurance obligations.  Unbeknownst to Plaintiffs, the Hotel's comptroller hid the true extent of the Hotel's delinquency on its insurance obligations from Plaintiffs and the Hotel's management until June 2009, by which time the Hotel was so far in arrears that it could not save the insurance from being cancelled.

3.      Even though Defendants knew that the comptroller hid the problem from Plaintiffs, Defendants concocted an allegation that Plaintiffs stole approximately $9,000 of employee withholdings for insurance premiums and converted them for use by Watchwood.  The Hotel's comptroller continued to take the $9,000 of employee withholdings even though she knew the insurance would be cancelled eventually.  Under these set of facts, Plaintiffs, who were not involved in any financial matters related to the insurance and were not owners of the Hotel, could not have been liable for any crime or "theft" at all.  Defendants indicted Plaintiffs without ever interviewing them, or even making any reasonable attempt to do so.  Defendants secured an indictment knowing that they lacked any evidence of theft whatsoever against Plaintiffs, and knowing that the charge as it was alleged against Plaintiffs lacked any reasonable basis under Maryland or any law.

4.      The DOL Defendants, Ms. O'Brien, Mr. Finizie and Ms. McKee, illegally and maliciously prosecuted this case because they thought it would be good for their careers.  Their conduct was not normal.  Indeed, the DOL rarely if ever attempted to bring an employee benefits case in a state criminal

court before.  DOL Defendants each knew there was no possibility a federal prosecutor would take on the case, but instead of instituting a civil investigation as mandated by DOL policy and practice, they elected to push this case as a criminal matter.  The Deputy State Prosecutor, Defendant Michael, only had a misdemeanor case against the Hotel's comptroller before the DOL Defendants approached them.  Once the prospect of a high profile, joint criminal effort with the DOL presented itself, Defendant Michael wasted little time signing off on the plan.  Defendant Michael told DOL Defendant McKee that he had no interest in prosecuting the Hotel's comptroller, but if DOL Defendant McKee could get her to push the guilt onto the Iranian owner of the Hotel, he would comply with the scheme.  Just a few days later, DOL Defendant McKee was able to get the Hotel comptroller to say what Defendant Michael wanted, and the wheels of the malicious and reckless prosecution of Plaintiffs were set in motion.

5.      The DOL Defendants immediately set to work on gathering "evidence" or the lack thereof, and on coaching witnesses such as Abbie Rhodes, the Hotel's comptroller.  Ms. Rhodes is a white female, who should have been the primary suspect of the investigation.  But Defendants were not interested in prosecuting a white female; rather, the goal was to prosecute the Iranian owner of the Hotel.  The DOL Defendants' investigation was shoddy, haphazard, incompetent, dishonest and malicious.  The DOL Defendants ignored exculpatory facts when it suited them, and coached a witness, who should have been a suspect, all in an effort to fabricate a story to place the blame on Plaintiffs.  Upon information and belief, the DOL Defendants, particularly Defendant McKee, had little experience or training in conducting a criminal investigation.  If she received training, it was grossly ineffective.

6.      The Defendant in the Maryland State's Prosecutor's office for Washington County was just as culpable as the DOL Defendants.  Defendant Michael not only allowed, but insisted that the DOL Defendants conduct the entire investigation.  Defendant Michael did nothing to confirm the results of the

investigation and knowingly pursued an indictment based upon this investigation when the evidence

provided to him did not indicate even probable cause for suspecting Plaintiffs of stealing anything.

Defendant Michael's actions were not only grossly negligent, but they were also carried out with

malicious intent to cause harm to people of Iranian descent.  Defendant Michael was content that they had

two "foreigners" to charge with the backing of the United States government.  Defendant Michael actively

sought attention from the press in order to personally benefit from this miscarriage of justice.  Defendant

Michael cared little for due process, and even less for the Plaintiffs' constitutional rights.

7.      Once Defendant Michael obtained his unconstitutional indictment, Defendant Michael took active

steps to hide the indictment from Plaintiffs, ensuring that Plaintiffs would have to be arrested so as to

maximize publicity for the criminal trial.  As Plaintiffs were long-time residents of the District of

Columbia, the arrest was performed by U.S. Marshals at Plaintiffs' home.  Even after the arrest, Defendant

Michael refused to allow Plaintiffs to be released on their own recognizance to comply with the Maryland

warrant, against the recommendation of the District of Columbia judge presiding over Plaintiffs'

extradition hearing.  Rather than taking the judge's recommendation to release Plaintiffs, Defendant

Michael deliberately and maliciously left Plaintiffs incarcerated for five days in the District of Columbia.

During these five days when Plaintiffs were incarcerated, Defendants prepared press releases and

organized media coverage of Plaintiffs' extradition to Montgomery County.  In particular, Defendant

Michael manipulated the press coverage for the trial to personally benefit himself.

8.      Plaintiffs were arrested at their home in front of their children, neighbors and friends.  A team of

U.S. Marshals in several vehicles ambushed Plaintiff Hassan Mohammadi as he walked to his car.

Plaintiff Yasaman Rowhani and her elderly mother witnessed the arrest from an upstairs window.  The

U.S. Marshals then entered the home and arrested Plaintiff Yasaman Rowhani as well.  Both of Plaintiffs'

children watched their parents led away in handcuffs.  None of the officers told the Plaintiffs with what they were being charged, other than to say that they stole something from the Hotel.

9.      The next day, Plaintiffs were led in shackles and chains before a District of Columbia judge for their extradition hearing.  Given that the hearing took place on a Friday afternoon, the matter was a relatively minor theft case, and that the Plaintiffs posed no flight risk, the judge was inclined to allow Plaintiffs to be released on their own recognizance to comply voluntarily with the Maryland warrant.  The judge, however, was hesitant to do so without the approval of Defendant Michael.  Inexcusably, Defendant Michael would not approve the judge's suggestion and insisted that Plaintiffs remain incarcerated so that Washington County could come retrieve them.  Defendant Michael was not afraid of Plaintiffs' fleeing, nor did he have any legitimate reason whatsoever to have Plaintiffs incarcerated.  He merely needed the additional time to prepare his press release and implement his publicity strategy.

10.     During their unnecessary and unconstitutional incarceration, Plaintiffs were confined with the general population.  Plaintiff Yasaman Rowhani, who has been battling breast cancer for years, took ill from the stress and had to be transferred to a hospital.  Plaintiff Hassan Mohammadi was unable to see her or to comfort her in her time of need.  Sadly and unfortunately, Plaintiff Hassan Mohammadi heard that his wife had been hospitalized, but was unable to care for her.

11.     Fortunately for Plaintiffs, they were fully exonerated at trial.  In fact, the trial court did not allow the case to even reach the jury and acquitted Plaintiffs at the end of the prosecution's case in chief.  The trial court found that the prosecution presented no evidence to support a charge of theft, and specifically that there was no evidence of intent and no evidence of a benefit to Plaintiffs.  Each of the Defendants knew that no evidence against the Plaintiffs existed, yet they the maliciously, recklessly and intentionally secured an indictment, arrest and incarceration of Plaintiffs.

**PARTIES**

12.     Plaintiff Hassan Mohammadi is a 60 year old male citizen of the United States of Iranian descent and has during all relevant times been a resident of the District of Columbia.  From November 2006 through August 2010, Plaintiff Hassan Mohammadi served as the Food and Beverage Manager for the Hotel, owned by Watchwood.

13.     Plaintiff Yasaman Rowhani is a 59 year old female citizen of the United States of Iranian descent and has during all relevant times been a resident of the District of Columbia.  From November 2007 through August 2010, Plaintiff Yasaman Rowhani was employed as the Food and Beverage Banquet Supervisor for the Hotel, owned by Watchwood.

14.     Defendant Colleen McKee, Esq. is an investigator for the DOL, Employee Benefit Services Administration, located at 1335 East-West Highway, Suite 200, Silver Spring, Maryland 20910.  Ms. McKee was responsible for the investigation, arrest and prosecution of Plaintiffs Hassan Mohammadi and Yasaman Rowhani in Washington County Maryland District Court.

15.     Defendant Cristina O'Brien, upon information and belief, at all relevant times, was a Supervisor at the United States Department of Labor, Employee Benefits Services Administration, located at 1335 East-West Highway, Suite 200, Silver Spring, Maryland 20910.  Ms. O'Brien directly supervised, directed and facilitated Ms. McKee's investigation, arrest and prosecution of Plaintiffs Hassan Mohammadi and Yasaman Rowhani in Washington County Maryland District Court.

16.     Defendant David Finizie is the Regional Criminal Coordinator for the United States Department of Labor, Employee Benefit Services Administration, located at Curtis Center, Suite 870 West, 170 S. Independence Mall West, Philadelphia, Pennsylvania 19106.  Mr. Finizie was responsible for the

investigation, arrest and prosecution of Plaintiffs Hassan Mohammadi and Yasaman Rowhani in Washington County Maryland District Court.

17.     Defendant Joseph Michael is the Deputy State's Attorney for Washington County, Maryland.  Mr. Michael was responsible for the investigation, arrest and prosecution of Plaintiffs Hassan Mohammadi and Yasaman Rowhani in the District Court of Maryland for Washington County, Maryland, with offices located at the Washington County Courthouse, 24 Summit Avenue, Hagerstown, Maryland 21740.  Mr. Michael is being sued in his personal capacity for violations of Plaintiffs' state and federal constitutional rights.  Moreover, Mr. Michael does not enjoy absolute prosecutorial immunity for malicious acts, acts of gross negligence, or for acts committed while acting in a non-prosecutorial role.

## VENUE AND JURISDICTION

18.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(1), (2), (3) and (4), as this action seeks to redress the deprivations under color of statute, ordinance, regulation, custom, or usage of a right, privilege, and immunity secured to Plaintiffs by the Fourth and Fourteenth amendments to the Constitution of the United States, 42 U.S.C. §§ 1983 and 1988, and arising under the laws, statutes and Constitution of the United States of America.  ~~This Court has jurisdiction over pendent state law claims pursuant to § 5-304 of the Court and Judicial Proceedings Article of the Annotated Code of Maryland.~~

19.     This Court is the proper venue under 28 U.S.C. § 1391.

**STATEMENT OF FACTS**

20.     On or about November 2006, Watchwood bought the Four Points Sheraton Hotel in Hagerstown,

Maryland.  The Hotel would later be renamed the Hagerstown Hotel and Convention Center.  Bahman

Rowhani was the sole shareholder of Watchwood, which owned the Hotel.  Watchwood named Plaintiff

Hassan Mohammadi the Food and Beverage Manager for the Hotel.  Plaintiff Yasaman Rowhani, Plaintiff

Hassan Mohammadi's wife and the sister of Bahman Rowhani, was named the Food and Beverage

Banquet Supervisor.  Neither Plaintiff Hassan Mohammadi nor Plaintiff Yasaman Rowhani had an

ownership interest in the Hotel or in Watchwood, which owned the Hotel.  At all relevant times during

Watchwood's ownership of the Hotel, the Hotel employed a general manager and a comptroller who were

responsible for the management and business affairs of the Hotel.  For a period from November 2006

through May 2008, the Hotel also employed a management company called Guests, Inc.

21.     Abbie Rhodes was the Hotel's long-time comptroller.  She held this position many years at the

Hotel under the prior ownership.  By the time Plaintiffs first met her, she was firmly ensconced as the sole

money manager for the Hotel.  She obtained this position, despite her lack of an advanced degree or

accreditation, simply due to her many years of work experience.  Previous ownership of the Hotel

recommended her to Watchwood.

22.     Ms. Rhodes actively sought to solidify her independence and control over the Hotel's finances.  In

November 2006, when Watchwood took over, it hired a management company called Guests, Inc. to help

run its business affairs in conjunction with Ms. Rhodes as comptroller, then it hired General Manager

Mike Callas.  By May 2008, Guests, Inc. and Watchwood terminated their relationship, in part due to

complaints from the General Manager and Ms. Rhodes that Guests Inc. provided no benefit to the Hotel's

management that she could not provide herself.

23.     As part of her duties, Ms. Rhodes was responsible for maintaining and administering the Hotel's payroll, including benefits.  She had the authority to sign company checks, pay and prioritize bills, and perform the day-to-day duties expected of any bookkeeper in a moderately-sized business.  Ms. Rhodes was expected to bring financial concerns to the attention of her General Manager, such as delinquent bills and insufficient funds to cover monthly expenses.  By May 2008, Farhad Jaberi was the Hotel's General Manager, the same position formerly held by Mike Callas.

24.     Another aspect of Ms. Rhodes' job was as primary contact with the Hotel's employee health insurance broker, Edward Lough.  Mr. Lough was a local insurance agent with Northwestern Mutual.  Like Ms. Rhodes, Mr. Lough had long history with the Hotel, acting as the Hotel's broker for employee insurance well before Watchwood took over.

25.     Mr. Lough also tapped his long-time partners Kelly & Associates to administer the Hotel's employee benefits, and CareFirst as the actual insurance provider.  Both companies provided these same services to the Hotel under the prior ownership.

26.     Approximately 20 or more employees were insured under the Hotel's insurance policy.  This number included Abbie Rhodes, who had the most comprehensive and expensive coverage of any employee, for her entire family.  Plaintiff Yasaman Rowhani was also covered, as well as her daughter who was also an employee of the Hotel.

27.     By 2008, the Hotel experienced financial problems due in part to the economic downturn and a loss of customers.  The Hotel downsized its staff and in many cases reduced the hours of many of its remaining staff.

28.     Because of its financial problems, the Hotel began having trouble paying its bills.  By December 2009, the Hotel fell behind on its insurance premiums.  Ms. Rhodes was fully aware of the situation but

did not convey the seriousness of it to the Hotel's management or to Plaintiffs for several months, out of

fear that the Hotel would cancel the employee's insurance coverage because it could no longer afford it.

As noted, Ms. Rhodes depended solely upon this insurance coverage for her entire family.

29.     Ms. Rhodes also did not bring to light the fact that several employees who had since become

ineligible for insurance coverage because of a reduction in their hours were still on the plan.  Both Ms.

Rhodes and Mr. Lough knowingly allowed part-time employees to enroll or stay enrolled on the Hotel's

insurance plan, making the coverage drastically more expensive to the Hotel than it otherwise should have

been.

30.     Another complicating factor with the Hotel's insurance coverage was the fact that it was unclear

exactly how much the Hotel owed in premiums.  In December 2008, CareFirst records showed that the

Hotel owed $9,411.72 less in premiums than Kelly & Associates, the insurance broker, claimed was owed.

It was not for another six months, in May 2009, after the Hotel requested and CareFirst finished an "audit"

of the discrepancy that it summarily decided that although it could not explain the discrepancy, the Hotel

owed CareFirst the additional $9,411.72.  However, CareFirst offered no evidence or documentation of its

audit whatsoever.  Kelly & Associates never even bothered to perform its own audit.

31.     During the first half of 2009, Ms. Rhodes actively concealed the true scope of the problem with the

insurance premiums from Hotel management and the Plaintiffs.  The Hotel fell behind on premiums

before, and even received cancellation notices at various times, both under Watchwood and under

previous ownership.  Ms. Rhodes minimized the nature of the insurance problems in 2009 because she

hoped that the issue would be resolved as it had in the past.

32.     The Hotel, however, fell so far behind in premiums that it became less and less likely that it would

be able to keep the coverage from being cancelled.  Ms. Rhodes knew that if Plaintiffs were made fully

aware of the situation, they would recommend to Hotel management that the insurance coverage be cancelled.

33.     Instead, Ms. Rhodes continued to take withholdings from employees' wages from December 2008 to June 2009, knowing that many of these employees were ineligible for insurance coverage and knowing that those who were otherwise eligible would be paying for insurance they would likely never receive.

34.     Mr. Lough, the insurance broker, loathed the idea that the Hotel should cancel its insurance policy. During this period, he emailed back and forth with Ms. Rhodes, asked about the status of the premium payments at times, but also added and made adjustments to the roster of Hotel employees with insurance coverage.  Mr. Lough had a history of going to great lengths to maximize his revenue from the Hotel's insurance coverage.  For example, he negotiated a renewal policy for the new ownership in late 2006/early 2007 that he knew was much more expensive for the Hotel than under previous ownership.  Mr. Lough also knowingly falsified insurance enrollment forms.  For example, he filled out information on the forms for part-time employees falsely showing that they were full-time employees so that they would be fraudulently eligible for insurance.  Mr. Lough then signed off on the forms on the line designated for Hotel management to sign to keep this fraudulent practice from coming to anyone's attention, including Plaintiffs.  Ms. Rhodes knew that several of the employees on the Hotel's insurance rolls were ineligible, but she never disclosed that information to Plaintiffs.

35.     In late March and early April of 2009, Mr. Lough brokered a renewal of insurance coverage for the Hotel.  He renewed the coverage knowing that it likely would be cancelled, but did not see fit to relay this information to Plaintiffs.  Instead, he merely suggested to Plaintiffs that the problems with the insurance might be solved by switching to a plan that was less expensive for the Hotel.  Ms. Rhodes coordinated with Mr. Lough to set up appointments for him to discuss insurance renewals with Hotel employees.  Mr.

Lough met with Hotel employees and had them sign up and pay for coverage he knew would be cancelled shortly.

36.     Finally, in June 2009, when the Hotel fell so far behind on insurance premiums that CareFirst threatened to cancel the coverage, Mr. Lough finally came clean to Plaintiffs.  Mr. Lough happened to meet Plaintiff Yasaman Rowhani in the lobby of the Hotel sometime in early June 2009.  They discussed the insurance problem, and he finally explained to her personally that the Hotel was so far behind in its premiums that it would lose its coverage if they were not paid in full by July 7, 2009.  Mr. Lough also told Plaintiff Yasaman Rowhani that he knew this loss of coverage was especially important to her as she was scheduled to have surgery in the near future.

37.     Now that Mr. Lough finally came clean, Plaintiff Yasaman Rowhani made a point of becoming actively involved in the effort to save the insurance.  Unfortunately, by June 2009, it was too late to save the insurance.  The Hotel owed over $40,000 in back premiums by the time Mr. Lough had his conversation with Plaintiff Yasaman Rowhani.  The Hotel was given until July 7, 2009 by CareFirst to pay its arrears in full in order to save the insurance coverage.  With the poor state of the Hotel's finances resulting from declining revenue in 2008 and 2009, this deadline was impossible to meet.

38.     On July 7, 2009, Kelly & Associates sent cancellation notices to the Hotel's employees.  The insurance was cancelled retroactively to February 2009 for all employees, including Plaintiff Yasaman Rowhani.  As a result, Plaintiff Yasaman Rowhani was forced to cancel her scheduled surgery.

39.     On July 8, 2009, Plaintiff Yasaman Rowhani met with Ms. Rhodes to discuss the cancellation.  Ms. Rhodes finally explained how the Hotel had not made payments on the insurance for months.  Plaintiff Yasaman Rowhani asked Ms. Rhodes why on earth she continued to take withholdings from employees when she knew the Hotel could not afford the insurance.  Ms. Rhodes had no answer for her.

14

Later, at the criminal trial, Ms. Rhodes testified under oath that the reason she had not stopped the withholdings was because she and her family relied on the insurance and did not want to see it cancelled.

40.     Only on July 8, 2009 did Mr. Lough send an email to Plaintiff Hassan Mohammadi and the Hotel's General Manager, Farhad Jaberi, fully explaining the situation with the insurance cancellation.  Mr. Lough also emailed Ms. Rhodes the same day advising her of the email to Plaintiff Hassan Mohammadi, saying he "just want[s] them to have all the info so they can't say they didn't' know."   This purportedly informative email would have been of much greater benefit to everyone involved if it had been sent months earlier.

41.     Now that Plaintiff Hassan Mohammadi and Plaintiff  Yasaman Rowhani were fully informed of the situation, Plaintiffs took what steps they could to rectify it.  On July 20, 2009, the Hotel sent a check for $10,359.00 directly to CareFirst to pay down the arrears.  CareFirst applied $1,290.00 of this payment to coverage for January 2009, but refused to activate the insurance going forward.  The remaining $9,035.00 was held by CareFirst for over a year and a half, and only was refunded to Watchwood in December 2010, when DOL Defendant Colleen McKee contacted CareFirst to determine where the money had gone.

42.     Plaintiffs Hassan Mohammadi and Yasaman Rowhani continued throughout July and August 2009 to try and reinstate the insurance coverage for the Hotel employees, but Ms. Rhodes took too long to share the true scope of the insurance problem so that by July 2009, the arrears accumulated to an amount where there was no hope of saving the coverage.

43.     On August 10, 2009, Watchwood filed for Chapter 11 Bankruptcy in an effort to save the Hotel.

44.     On August 18, 2009, Abbie Rhodes was terminated.  The Hotel replaced her with a part-time bookkeeper.

45.     The Hotel employees who lost their insurance coverage were understandably upset, including

Plaintiff Yasaman Rowhani.  One of the most vocal was a former employee named Patricia McDonnell.

On August 5, 2009, Ms. McDonnell filed a complaint with the DOL concerning her lapsed insurance

coverage.

46.     On January 1, 2010, the DOL opened a civil investigation of the Hotel's employee benefits plan

based on Ms. McDonnell's complaint.  Michael Piro of the DOL Employee Benefits Security

Administration ("DOL EBSA") was the assigned investigator.  Mr. Piro's civil investigation was based

solely upon the information provided by the disgruntled ex-employee Ms. McDonnell and, upon

information and belief, from Kelly & Associates.

47.     On March 15, 2010, the DOL EBSA opened a criminal investigation of the Hotel's employee

benefits plan based on Mr. Piro's recommendation.  DOL Defendant Colleen McKee was assigned as the

investigator.  The recommendation that a criminal investigation be opened was based on an internal DOL

assessment that the proof of claim deadline already passed in the Watchwood bankruptcy.  The statute of

limitations for filing a civil complaint under the Employee Retirement Income Security Act ("ERISA")

had not passed, however.

48.     Mr. Piro's investigative notes, dated February 1, 2010, which he provided DOL Defendant McKee,

made mention of the "audit" and "discrepancies" between CareFirst and Kelly & Associates in what they

were billing the Hotel for insurance premiums, but seemed to indicate that this audit was performed as a

result of some untoward action by the Hotel that revealed "discrepancies" and that the Hotel owed four

months of premiums.  The "audit", presumably performed by CareFirst, revealed nothing.  To date, and

upon information, no evidence of this audit has ever been provided to the DOL or anyone else outside of

CareFirst.  All CareFirst ever provided the Hotel was a simple letter stating that it could not explain why

its bill to the Hotel was $9,411.72 less than the Kelly & Associates bill, and that it was going to go with

the amount Kelly & Associates wanted to charge.  The audit did not reveal discrepancies.  It was

conducted at the Hotel's insistence because of discrepancies.  Regardless, Ms. McKee failed to question or

investigate CareFirst or Kelly & Associates regarding their involvement in the Hotel's billing

discrepancies, and also failed to acknowledge or realize that at least part of the reason Ms. Rhodes had not

been paying the insurance premiums may have been due in part to the fact that CareFirst and Kelly &

Associates could not agree on the amount owed.

49.     Upon information and belief, the decision to open a criminal investigation solely based on this

shoddy and incomplete investigation was approved by DOL Defendant Cristina O'Brien, DOL Defendant

McKee's Supervisor.

50.     DOL Defendant McKee began her criminal investigation on or about April 5th, 2010.  She

contacted Kelly & Associates and requested documents relating to the Hotel's history over premium

payments and service comments.

51.     On April 6, 2010, DOL Defendant McKee interviewed complainant Ms. McDonnell.  She learned

that Ms. McDonnell was listed as a creditor in Watchwood's bankruptcy and that she had $30,000 in

unpaid medical bills.  She also learned that on or about September 2009, Ms. McDonnell filed a complaint

with the Washington County Sheriff's Department alleging that a check for approximately $400 that she

gave to Abbie Rhodes to pay for her Consolidated Omnibus Budget Reconciliation Act payments had not

been used by the Hotel for that purpose.  Abbie Rhodes did not share the situation about Patricia

McDonnell with Plaintiffs.  Plaintiffs only learned of it later in 2009 when a Sheriff's deputy came to the

Hotel to search through the Hotel's documents.

52.     On May 14th 2010, DOL Defendant McKee sent a letter to Washington County Sheriff's deputy Michael Boras, requesting they coordinate their efforts to investigate allegations raised by Ms. McDonnell.

53.     On June 1, 2010, DOL Defendant McKee made her first contact with Defendant Joseph Michael, the Deputy State's Attorney for Washington County.  During a phone conversation, Defendant Michael explained to DOL Defendant McKee what he "knew" about the case.  He referenced the audit that had been performed by CareFirst, and how he believed this audit proved that "something shady" was going on at the Hotel.  At the time though, he only had what in his opinion was a petty theft case against Abbie Rhodes because she was the only one who signed the documents.  Defendant Michael told DOL Defendant McKee that he wanted to pursue a more noteworthy defendant – the owner of the Hotel, not the bookkeeper.  DOL Defendant McKee was only too happy to oblige.

54.     In July and August 2010, DOL Defendant McKee made contact with both CareFirst and Kelly & Associates to get records concerning the Hotel's insurance coverage.  She received, without subpoena, billing records, lists of enrollees, and lists of unpaid claims.  DOL Defendant McKee never asked to see records of the CareFirst audit, nor did she find it odd that neither CareFirst nor Kelly & Associates ever produced a General Insurance Agreement for the year 2008.  All of the insurance agreements or other documents supplied by CareFirst and Kelly & Associates were signed by either Abbie Rhodes, Mr. Jabari, or a combination of both.  No insurance documents were signed by Plaintiffs.  DOL Defendant McKee never questioned nor considered that the billing discrepancies and poor record keeping demonstrated by CareFirst and Kelly & Associates played a significant role in the Hotel's cancellation of insurance coverage.

55.     In September 2010, DOL Defendant McKee monitored Watchwood's Chapter 11 bankruptcy.  She learned that Bahman Rowhani was the sole shareholder of Watchwood, which owned the Hotel.  She also knew from her limited investigation thus far that Bahman Rowhani was Plaintiff Yasaman Rowhani's brother and that he had no role in running the day to day operations of the Hotel.

56.     At this time, and for the majority of her investigation, DOL Defendant McKee targeted Bahman Rowhani for criminal charges.  DOL Defendant McKee and Defendant Michael switched their gaze to Plaintiffs only a few weeks before they were arrested on July 28, 2011.

57.     On September 9, 2010, Watchwood's bankruptcy was dismissed by consent.  A receiver was appointed for the Hotel and management of the Hotel was forced to leave the premises permanently.  DOL Defendant McKee was aware of this development.

58.     On October 11, 2010, CareFirst, without subpoena, supplied a list of denied claims for Hotel employees after January 31, 2009.  Plaintiff Yasaman Rowhani was on the list having unpaid claims.

59.     On October 13, 2010, DOL Defendant McKee prepared a report of her investigation to date.  DOL Defendant McKee's report laid out the case that Ms. McDonnell alleged the Hotel took withholdings from employees for insurance premiums while it knew the insurance had not been paid.  DOL Defendant McKee believed Bahman Rowhani, as owner of the Hotel, diverted plan assets for use by the Hotel, constituting a potential violation of 18 U.S.C. § 669.  She did not mention that Ms. McDonnell was no longer employed at the Hotel at the time she made her complaint, nor did she mention or even know that Ms. McDonnell had been employed as a waitress and had no knowledge of what was known about the insurance premiums.  DOL Defendant McKee did not mention that she made no attempt whatsoever to contact anyone at Watchwood to learn the full story concerning the Hotel's insurance.  Also, DOL

Defendant McKee did not mention that she had no proof whatsoever that any of the allegations were willful, or even knowingly committed.

60.     At this point in DOL Defendant McKee's investigation, she alleged that Bahman Rowhani "stole" $30,000 worth of unpaid insurance premiums.  She did not realize that the Hotel made payments towards the insurance in 2009.  By the time DOL Defendant McKee and Defendant Michael secured an indictment against Plaintiffs, DOL Defendant McKee could only show a "theft" of approximately $9,000.  Not coincidentally, this amount was almost exactly the same that the Hotel disputed when CareFirst conducted its audit in 2009.

61.     Despite DOL Defendant McKee's poorly investigated and paper-thin allegations, DOL Defendant O'Brien still pitched the case to a prosecutor.  DOL Defendant O'Brien contacted DOL Defendant Finizie, who was the DOL Regional Criminal Coordinator in Philadelphia, Pennsylvania and asked him to assist DOL Defendant McKee in pitching the case to a prosecutor.

62.     On October 18, 2010, DOL Defendant Finizie told DOL Defendant McKee that he would accompany her to meet with Defendant Michael.  DOL Defendant Finizie believed that state prosecution was their only option as a federal prosecutor would not likely take a criminal case with only $30,000 of damages.

63.     On October 20, 2010, DOL Defendant McKee interviewed Linda Beard, who had been employed at the Hotel.  Ms. Beard told DOL Defendant McKee that she filed a claim with Watchwood's bankruptcy proceeding but did not want to file a complaint because Abbie Rhodes would be held liable.

64.     On October 21, 2010, DOL Defendants McKee and Finizie traveled to meet Defendant Michael at the state prosecutor's office in Hagerstown, Maryland.  Defendant Michael told them that he would not take the case if it was against Abbie Rhodes.  Defendant Michael made it clear he would only pursue the

case on the condition that Ms. Rhodes alleged that the owner specifically told her not to pay the insurance. DOL Defendants McKee and Finizie did not share with Defendant Michael that this case had been turned down already by a federal prosecutor.

65.     Defendant Michael also informed DOL Defendants McKee and Finizie that he would prosecute the case as a single count felony scheme against the owner, but that he would do no investigative work whatsoever.  Defendant Michael's statements to DOL Defendants McKee and Finizie clearly demonstrate his malicious intent or at best, it indicates that he was grossly negligent in his investigation and decision to prosecute Plaintiffs.  Defendant Michael insisted that the DOL conduct the entire investigation.  Defendant Michael offered to issue administrative subpoenas for records, but that was the extent of his participation. Defendant Michael did not care that the persons he entrusted to this investigation admittedly had little to no knowledge of Maryland criminal law or that the DOL Defendants McKee and Finizie had their own motives to fabricate a case against Plaintiffs.  What Defendant Michael cared about, and thought he knew, was that the owner of the Hotel was Iranian and would be likely easy to convict whether he had committed a crime or not, and that he would receive positive press coverage for convicting him, especially if he had the DOL endorsing the conviction.  The DOL Defendants and Defendant Michael all clearly acted outside of the scope of their duties in an effort to obtain personal career goals.

66.     On October 29, 2010, DOL Defendant McKee interviewed Abbie Rhodes for the first time.  DOL Defendant McKee got Ms. Rhodes to say exactly what Defendant Michael demanded she say, namely that she only made payments to the insurance carrier with express permission from the owner.  This statement, of course, was a lie.  Neither Bahman Rowhani, the sole shareholder of Watchwood, nor the Plaintiffs ever gave her any such direction.  Ms. Rhodes paid all the bills as they became due, as long as there was money to pay them.

21

67.     Ms. Rhodes also lied to DOL Defendant McKee by claiming that Plaintiffs were the owners of the Hotel and that she could only make payments with their express permission.  Ms. Rhodes was lying because she knew she would be held liable for the employees' unpaid insurance if the truth were known. DOL Defendant McKee knew or should have known that Ms. Rhodes was lying, at least to the extent that she already had evidence that Plaintiffs were not owners of the Hotel.

68.     Ms. Rhodes made no mention of the CareFirst audit or any discrepancies and disputes the Hotel had with its insurance carrier in 2009.  Despite being aware of these issues, DOL Defendant McKee did not ask about them.  Also, despite having literally unfettered access to Watchwood's records through the court-appointed receiver for the Hotel, DOL Defendant McKee did not request any information related to Ms. Rhodes' personal work files or communications to back up her claims that she alerted "ownership" about the unpaid insurance prior to June 2009.

69.     On October 31, 2010, DOL Defendant McKee reviewed a spreadsheet of unpaid insurance claims resulting from cancellation of the Hotel's insurance in 2009.  On this spreadsheet, DOL Defendant McKee saw that Plaintiff Yasaman Rowhani was listed as having unpaid claims as a result of the cancellation. Likewise, Plaintiffs' daughter Sanaz Mohammadi also had unpaid claims as a result of the cancellation. DOL Defendant McKee knew that Plaintiff Yasaman Rowhani was a victim, yet the DOL Defendants continued to fabricate a criminal case against Plaintiff Yasaman Rowhani.

70.     On November 17, 2010, DOL Defendant McKee contacted the Court-appointed receiver for the Hotel to obtain bank records for Watchwood.  As noted, Watchwood filed for Chapter 11 bankruptcy in August 2009.  A year later, in August 2010, the bankruptcy court appointed a receiver for the Hotel and the bankruptcy was dismissed by consent.  As a result of these events, Watchwood was forced to give up management of the Hotel.  The receiver appointed was Guests, Inc.  Guests Inc. previously managed the

hotel for Watchwood from November 2006 to May 2008.  Guests, Inc. provided DOL Defendant McKee with Watchwood's banking and payroll records, all without subpoena, and with no notice whatsoever to Watchwood that it was sharing its company information with a DOL investigation.

71.     On November 22, 2010, Abbie Rhodes called DOL Defendant McKee to advise her that she failed to mention in their previous interview that Watchwood actually made multiple payments on the health insurance in 2009.  Ms Rhodes also advised DOL Defendant McKee that approximately $9,000 of these payments should have been returned to the Hotel because CareFirst had not applied this money to the insurance coverage.

72.     On November 29, 2010, DOL Defendant McKee interviewed Edward Lough, the insurance agent who brokered the employee health insurance for the Hotel under Watchwood and under the prior ownership.  Mr. Lough could not state that he ever discussed the potential cancellation of the insurance with anyone other than Abbie Rhodes prior to June 2009 when he advised Plaintiff Yasaman Rowhani that her scheduled surgery would not be covered if the Hotel did not make up several months of unpaid insurance premiums by July 7, 2009.  The only Hotel employee prior to June 2009 Lough confirmed had personal knowledge of the full scope of the pending insurance cancellation was Abbie Rhodes.  DOL Defendant McKee did not care that Plaintiffs Hassan Mohammadi and Yasaman Rowhani did not have any idea about the unpaid insurance premiums because DOL Defendant McKee had her own personal goals in fabricating a case against Plaintiffs.

73.     On December 10, 2010, DOL Defendant McKee contacted CareFirst to confirm that there was a $9,000 refund due to Watchwood for an insurance premium payment that was not applied to the Hotel's employee health insurance.

23

74.      On December 23, 2010, CareFirst returned the $9,000 to the Hotel, currently under the

management of Guests, Inc., the Court-appointed receiver for the Hotel.  CareFirst kept this money in its

account for almost a year and a half.  Despite having cooperated with DOL Defendant McKee's criminal

investigation of the Hotel on several occasions, CareFirst never made DOL Defendant McKee aware of

the fact that it owed $9,000 to the company she was investigating for "theft."  Also, despite the fact that

CareFirst showed itself to be inept and dishonest in its financial record keeping, DOL Defendant McKee

continued to trust CareFirst and did not question it about the internal "audit" that had been performed by

CareFirst in the spring of 2009 concerning the Hotel's insurance bill, or even ask for any records of the

discrepancies between CareFirst's and Kelly & Associates' bills to the Hotel.  DOL Defendant McKee's

failure to further inquire into this audit is all the more puzzling as the state prosecutor Defendant Michael

mentioned this audit as evidence that "something shady" had been ongoing at Watchwood.  The fact that

DOL Defendant McKee did not request additional information from CareFirst demonstrates that she had

her own personal motives in putting together a criminal case against Plaintiffs or that she was grossly

negligent in performing her responsibilities.

75.      On January 3, 2011, DOL Defendant McKee contacted Guests Inc., the court-appointed receiver at

the Hotel, and advised it that the $9,000 recently refunded to the Hotel by CareFirst must be returned to

the employees who made withholdings.  DOL Defendant McKee received the specific approval of her

supervisor, DOL Defendant O'Brien, to force Guests Inc. to refund the money in full to Hotel employees,

who authorized withholdings for insurance from February to June 2009.  Guests Inc., at DOL Defendant

McKee's direction, divided the money amongst the employees pro rata.  Plaintiff Yasaman Rowhani was

one of the former employees who received a partial refund of her withholdings.  In fact, DOL Defendant

McKee noted on a spreadsheet she created to break down the amount being refunded that Plaintiff

Yasaman Rowhani was the "owner's wife", despite the fact that she knew this statement was not true.

76.     On January 4, 2011, DOL Defendant McKee contacted Defendant Michael regarding the status of

the investigation.  Having already successfully coached Abbie Rhodes to say she could not write checks

without permission, DOL Defendant McKee asked Defendant Michael if there was any other element of

the case he would like her to further develop.

77.     On January 20, 2011, DOL Defendant O'Brien contacted DOL Defendant Finizie to ask his

opinion on sharing their investigation with their DOL colleagues who opened a parallel civil investigation

of the Hotel on the same issue.  DOL Defendant Finizie told DOL Defendant O'Brien that they should not

share this information with the DOL civil investigation unless the state prosecutor Defendant Michael

gave his express permission.  DOL Defendant Finizie claimed to be afraid of getting into trouble if they

allowed the DOL civil investigation to access the information.  DOL Defendant Finizie had no reasonable

cause to refuse to allow the DOL civil investigation access to evidence that had been gathered solely by

DOL Defendant McKee and without subpoena.  Nor did DOL Defendant Finizie have reasonable cause to

believe or assert that this information could only be shared with the express permission of the state

prosecutor, when he knew for a fact that Defendant Michael had not started a grand jury inquest, had not

issued a subpoena, and had not lifted a finger to assist the investigation in any way.  By this time, the DOL

Defendants were so obsessed with bringing a criminal case over $9,134.03, they actively obstructed a civil

investigation in their own agency.  The DOL Defendants acted as if they worked for Defendant Michael

not the DOL.

78.     On January 21, 2011, DOL Defendant McKee contacted Defendant Michael.  DOL Defendant

McKee admitted that the amount allegedly stolen was now only $9,134.03 because she had not realized

that CareFirst still held $9,000 the Hotel previously made towards its insurance premiums.  She also asked

for his permission to share her investigation file with the DOL civil investigation unit.

79.     On February 25, 2011, DOL Defendant McKee again contacted Defendant Michael to ask if he

was interested in still pursuing Bahman Rowhani (the sole shareholder of Watchwood, which was the

former owner of the Hotel) for "theft" of $9,134.03.  She asked him what more he needed to prosecute the

case.

80.     In April 2011, DOL Defendant McKee interviewed several former Hotel employees.  Not a single

employee gave her any evidence demonstrating that Plaintiffs stole anything under Maryland law or any

law whatsoever.  Many of them did not know the insurance was in danger of being cancelled until June

2009, the same time Plaintiffs became aware of the situation.  Many of the former employees commented

that Plaintiffs were on the property only a few times a week, and some commented that Plaintiffs were

foreigners and difficult to understand.  At least one employee speculated that the Plaintiffs were from

Pakistan.  DOL Defendant McKee knew or should have known that both Plaintiffs were U.S. citizens of

Iranian descent.

81.     On May 3, 2011, DOL Defendant McKee reported to Defendant Michael and asked him to charge

Plaintiffs with theft instead of Bahman Rowhani, the sole shareholder of Watchwood, which had owned

the Hotel.  The sole reason for this suggestion was because she had not found even a single person who

had spoken to Bahman Rowhani about the insurance provided by the Hotel.  DOL Defendant McKee

asked Defendant Michael to charge and prosecute Plaintiffs Hassan Mohammadi and Yasaman Rowhani,

knowing that she failed to gather one shred of evidence against them.  She made no suggestion of charging

Ms. Rhodes, despite the fact that Ms. Rhodes had more knowledge, motive and communication with

employees about the insurance than any other person.  Ms. Rhodes is white and a long-time Hagerstown resident.

82.     DOL Defendants O'Brien, McKee and Finizie refused to allow, and actively interfered with a DOL civil investigation, in favor of prosecuting a U.S. citizen of Iranian descent.  When Bahman Rowhani became an undesirable target, then his sister and brother-in-law replaced him, as they are also of Iranian descent and, so each of the Defendants thought, should be easy to prosecute with no evidence.  There was no evidence that Plaintiffs committed theft under Maryland law, ERISA, or the federal law that the DOL Defendants claimed to have been enforcing.  The decision to relentlessly pursue prosecution in this matter is all the more disconcerting given that the DOL EBSA's own enforcement manual calls for criminal prosecutions only where the violation is egregious or large, where it is desirable and likely that the accused will be incarcerated, and where there is a history of ERISA violations.  In the prosecution at issue, the amount allegedly stolen was less than $100,000, the chances of incarceration were slim given the fact that any qualified judge would throw the case out for lack of evidence, and neither Plaintiff had any history of ERISA violations whatsoever.  The DOL Defendants chose to prosecute Plaintiffs because they are of Iranian descent, they were outsiders to Hagerstown, and they would likely not be sympathetic defendants to a jury.  The DOL Defendants were seeking to advance their own careers by expanding the DOL's reach into state court to prosecute a petty case with no evidence.  The DOL Defendants did not know and did not care to know what proof was required to prosecute someone for theft in Maryland, and they did nothing to investigate or uncover such proof before bringing charges against Plaintiffs.  In doing so, the DOL Defendants exceeded the scope of the DOL's authority for their own personal gain and violated the DOL's own internal policies and procedures.

83.     On May 9, 2011, DOL Defendant McKee sent a letter to Ms. Rhodes because she had not been able to contact her since the previous October.  Ms. Rhodes disconnected her phone and refused to respond to previous correspondence.  This same day, DOL Defendant McKee claimed she attempted to reach Bahman Rowhani, the sole shareholder of Watchwood, which formerly owned the Hotel.  She did not speak with Mr. Rowhani and did not leave any message for him.  DOL Defendant McKee never previously attempted to reach Mr. Rowhani prior to this date, and never spoke to him at all.

84.     On June 1, 2011, Defendant Michael secured a grand jury indictment against Plaintiffs.  Upon information and belief, his sole witness at the grand jury was DOL Defendant McKee.  Defendant Michael secured these indictments solely on the word of the DOL Defendants.  He, by his own admission and desire, did absolutely no investigation whatsoever.  Even though he was presumably more acquainted with Maryland law than the DOL Defendants, he still did not recognize or care that he did not have sufficient evidence to charge Plaintiffs with any crime.  Like the DOL Defendants, Defendant Michael was happy to prosecute Plaintiffs with no evidence because they are of Iranian descent, and, as outsiders in Hagerstown, would likely be easy to convict without evidence in front of a local jury.  The fact that an indictment was secured can only mean that both Defendant Michael and DOL Defendant McKee, if she was a grand jury witness, conspired to present knowingly false testimony.  Neither Defendant Michael nor DOL Defendant McKee made any attempt to contact Plaintiffs prior to securing this unlawfully obtained indictment.

85.     On June 8, 2011, DOL Defendant McKee received a report from Guests, Inc., the court-appointed receiver for the Hotel, detailing the withholding refunds that were sent to former employees.  DOL Defendant McKee again noted that Plaintiff Yasaman Rowhani was one of the persons listed as receiving a refund.  DOL Defendant McKee did not consider, or recklessly ignored the fact that she was prosecuting a person who was directly harmed by the cancellation of the insurance.  As for the other employees on the

28

list, DOL Defendant McKee commonly referred to them as "victims". The DOL Defendants knew or should have known that Plaintiff Yasaman Rowhani was one of the victims.

86.     On June 24, 2011, Defendant Michael began making arrangements to have Plaintiffs arrested. Defendant Michael had no basis to believe Plaintiffs were a flight risk, yet he made no attempt to contact Plaintiffs to ask for their voluntary surrender. In fact, no one involved in the investigation made any legitimate attempt to contact Plaintiffs. Plaintiffs were residing in Washington, D.C. in the same house they occupied for the previous twenty-five years, completely unaware that there were any indictments against them. Defendant Michael emailed Sgt. James Cooper, a Washington County Sheriff's deputy and asked him to make the arrest. Defendant Michael referred to Plaintiff Mr. Mohammadi as the "Muhammed dude," and generally made clear his contempt and disregard for Plaintiff Hassan Mohammadi's rights. Defendant Michael later contacted Defendant McKee to advise her to be prepared for Plaintiffs' arrest and that he would "make sure" his boss approved extradition. Defendant Michael assured DOL Defendant McKee that Plaintiffs would be caught if they attempted to flee the country, despite the fact that he had no reason to suspect they would make such an attempt, especially because Plaintiffs had no idea they were even under suspicion. Finally, Defendant Michael offered to make arrangements for the DOL to interrogate Plaintiffs at the Washington County Sheriff's Department when Plaintiffs were in custody.

87.     On June 27, 2011, DOL Defendant McKee emailed Defendant Michael and Washington County Sheriff's Deputy Michael Cooper to say that she had not been able to contact Plaintiffs. She did not mention that her efforts to contact Plaintiff consisted of a phone call to numbers she knew or should have known were out of service, and that she had not used the one contact number she had in her files that was current. DOL Defendant McKee, like the rest of the DOL Defendants, and Defendant Michael wanted

Plaintiffs arrested so as to maximize the press coverage of the event and to personally benefit their own careers.  None of the Defendants were acting within the scope of their authority as none of the Defendants sought justice.  Rather all of the Defendants sought personal benefit.

88.     Over the next two weeks, DOL Defendant McKee, at the direction of Defendant Michael, went to great lengths to secure physical descriptions and background information on Plaintiffs so as to secure the arrest warrants.  During this time, she made no effort to contact Plaintiffs by phone or by any other means.  From her background searches, DOL Defendant McKee realized or should have realized that Plaintiffs were easy to find because they lived in the same home for over twenty-five years.

89.     On July 14, 2011, Defendant Michael sent an email to Dawn White, who coordinated the arrest warrants for the Washington County Sheriff's Department.  Defendant Michael requested to be "kept in the loop" so that he could get press coverage coordinated.  Defendant Michael was more concerned about press coverage than the actual investigation.

90.     On July 14, 2011, DOL Defendant McKee alerted DOL Defendants Finizie and O'Brien that Plaintiffs' arrests were imminent and that a press release needed to be prepared.  Not only was Defendant Michael concerned about press coverage, but so were the DOL Defendants.

91.     In the morning of Thursday, July 28, 2011, U.S. Marshals executed the arrest warrant at Plaintiffs' home in Washington, D.C.  Plaintiff Hassan Mohammadi attempted to back his car out of his driveway when, out of nowhere, several unmarked police cars blocked him in the driveway.  He was pulled from the car and handcuffed by at least 10 or more armed U.S. Marshals.  His wife, Plaintiff Yasaman Rowhani, who was still in her night clothes, saw what happened from the window upstairs.  Both of Plaintiffs' daughters and Plaintiff Yasaman Rowhani's elderly mother also were in the house when the arrest occurred.  The U.S. Marshals took Plaintiff Yasaman Rowhani into custody as she came downstairs.  She

asked the U.S. Marshals what they did to deserve such treatment, but the only answer anyone gave was that they had been accused of theft in Washington County, Maryland.  Plaintiffs had absolutely no idea what they could have been accused of stealing.  One of the female marshals accompanied Plaintiff Yasaman Rowhani back upstairs so she could change into presentable clothes before being hauled away in handcuffs.

92.     In addition to the trauma Plaintiffs and their family experienced in being arrested for a crime they did not commit, or were even aware, they were afforded the additional humiliation of being arrested in front of their friends and long-time neighbors.  One of their neighbors, a local doctor, actually spoke with the U.S. Marshals to ask them to move their cars so she could get to work.

93.     Defendants were taken to the District of Columbia Superior Court for an extradition hearing.  They were kept in separate holding cells overnight before they appeared in front of a judge the following day.  At the hearing, they were each brought into the courtroom in jumpsuits and shackled to at least six other prisoners.  Plaintiffs were represented at the hearing by local attorney Frederick D. Cooke, Jr.  Mr. Cooke asked the judge to release Plaintiffs on their own recognizance, a request the judge was prepared to accept as Plaintiffs were obviously not flight risks, but the judge had not yet heard back from the prosecutor's office in Washington County for their approval.  Defendant Michael did not approve of Plaintiffs release on their own recognizance.  This decision was made with the sole purpose of maximizing press coverage and exposure for Defendant Michael's own individual efforts in prosecuting Plaintiffs.

94.     As the Washington County prosecutor's office did not allow Plaintiffs to be released upon their own recognizance, despite full knowledge that neither Plaintiff was a flight risk, Plaintiffs were held in separate jail cells in Washington, D.C. over the weekend.  Plaintiffs were advised that Washington County

Sheriff's deputies would be taking them to Hagerstown on Monday.  Plaintiffs were still confused as to exactly what were the charges against them.

95.     On Friday, July 29, 2011, Plaintiffs were transferred to the District of Columbia Central Detention Facility at 1901 D Street, SE, a large D.C. correctional facility housing over 2,000 criminal offenders of all types.  Both Plaintiffs were strip-searched prior to being incarcerated.

96.     Plaintiff Yasaman Rowhani, who had a history of breast cancer, fell severely ill while in custody.  She had to be transferred to a hospital, still under guard.  Plaintiff Hassan Mohammadi had to sit in his cell, sick with worry, helpless to do anything for his wife.

97.     On Monday, August 1, 2011, Plaintiffs expected to be extradited to Washington County, Maryland.  Instead, no one from Washington County ever came.  Plaintiffs were held in custody in Washington, D.C. for a total of five days, from Thursday morning until the following Tuesday, August 2, 2011, when on the sixth day, they were finally transferred to Washington County, Maryland for a bond hearing.  The reason for the six day delay was solely because all Defendants were not yet finished coordinating their press releases and arranging for news coverage of Plaintiffs' arrival in Washington County.  Defendants enjoyed their weekend and they had not bothered to do any work on these preparations over the weekend, despite all being fully aware of Plaintiffs' arrests the previous Thursday morning.

98.     On August 1, 2011, DOL Defendants Finizie and McKee coordinated preliminary press release drafts at the request and instruction of Defendant Michael.  Defendants' conduct related to the preparation of press releases demonstrates that the prosecution of Plaintiffs was not about justice but personal achievement and benefit.

99.     On August 2, 2011, DOL Defendants Finizie and McKee continued to work with Defendant

Michael on the press release, and gave detailed information to DOL employee Jeff Hinman for inclusion

in an agency "Daily Digest", including how the case first came to the DOL's attention and the fact-

gathering process through the state prosecutor's office.  DOL Defendants' malicious and reckless conduct

departed from normal DOL ESBA prosecutions.  According to DOL ESBA press releases, and upon

information and belief, around this same time, the DOL ESBA civilly sued a white business owner for

diverting $144,459 from an employee benefit plan in North Carolina.  By contrast, the DOL Defendants

actively blocked the DOL's civil investigation against Plaintiffs with no evidence of criminal wrongdoing

and for damages approximately 15 times less than what the same agency brought a civil case against a

white business owner located in North Carolina.

100.    Another press release from July 2011 detailed the efforts of DOL EBSA employee Kristi Gotcher

in "unraveling" problems arising "when an error by a global engineering and construction company,

compounded by its auditor's mistake" caused two families to lose their insurance coverage.  By contrast,

the DOL Defendants did nothing to investigate the mistake and the suspiciously terse "audit" performed

by CareFirst and Kelly & Associates, which likely had as much to do with the Hotel's insurance problems

as any other single factor.

101.    DOL Defendant McKee asked Defendant Michael to issue the official press release through his

office, but he declined and asked that it be issued through the DOL ESBA.  However, Defendant Michael

insisted that he be given the finalized press release so he could forward it personally to his preferred press

contacts.  All of the Defendants put more effort into the press release and media strategy than they did

with the investigation against Plaintiffs.

102.    Finally, on Tuesday, August 2, 2011, Plaintiffs were transferred from the District of Columbia to Hagerstown, Maryland to appear for their bond hearing.  They were transferred by Washington County Sheriff's deputies who warned them to be ready for media coverage awaiting their arrival.  Defendants organized a great deal of media coverage for the big bust of Plaintiffs who did nothing illegal, but simply because they are of Iranian descent.

103.    Later that afternoon, Plaintiffs' bond hearing was held.  Despite Defendant Michael's knowledge that neither Plaintiff was a flight risk and that he had information it might actually be dangerous for Plaintiffs to return to Iran, Defendant Michael nevertheless represented to the judge that bail should be set and their passports surrendered.  Plaintiffs Hassan Mohammadi and Yasaman Rowhani were finally granted bail of $20,000 and $10,000, respectively.  Plaintiffs were held in custody yet another night until their passports were surrendered, then were finally released on Wednesday, August 3, 2011, on the seventh day of incarceration.

104.    News stories appeared in local newspapers and on local television stations later that day, each reporting incorrect facts and accusations.  Many of the stories were based upon a press conference that Defendant Michael held after the hearing.  In an August 2, 2011 story by Paul Espinosa on your4state.com, it was reported that the prosecution's primary concern was getting the victims what they bargained.  The story failed to mention that Plaintiff Yasaman Rowhani was known to be a "victim" from the same lapse of insurance.

105.    Another news story by Dan Dearth appeared in the Hagerstown Herald-Mail on August 2, 2011.  Mr. Dearth reported that Defendant Michael claimed Plaintiffs stole "approximately $17,000 from roughly 19 employees."  The story did not mention that the alleged amount was actually only $9,134.03 and that Plaintiff Yasaman Rowhani was one of the alleged victims.

106.    On August 4, 2011, the DOL EBSA issued its press release.  Defendant Michael requested that the DOL Defendants forward the release to his preferred local press contacts.  In the release, the DOL alleged that Plaintiffs stole $18,000, when DOL Defendants knew there had been only at most $9,134.03 of withholdings not returned to employees.  The release did not mention that Plaintiff Yasaman Rowhani was one of the alleged "victims".  Also, the release did not mention that there was no evidence to suggest that Plaintiffs stole anything, or even knew that the withholdings were not being allocated towards premiums prior to June 2009, by which time it was too late to save the insurance.  The release did not reveal that the state prosecutor Defendant conducted no investigatory work whatsoever and that the entire investigation into the alleged violations of state law was performed by DOL Defendants who knew nothing of Maryland criminal law, and upon information and belief, were not attorneys licensed to practice in Maryland nor even admitted *pro hac vice*.  The release did not reveal that the DOL EBSA never before pursued such a small criminal matter in state court, nor did it reveal that it actively blocked its own civil investigation.

107.    The DOL EBSA press release quoted Mabel Capolongo, an unnamed DOL Defendant and regional director of the DOL EBSA, who stated "[T]he [DOL EBSA] is committed to ensuring that any group of workers, no matter how small, is not victimized by those who would misappropriate their workers' hard-earned money and violate their obligation to handle plan assets with the utmost of care."  Ms. Capolongo did not explain how prosecuting Plaintiffs for a state crime where the investigation had not uncovered any proof of theft furthered this goal.  Nor did Ms. Capolongo mention that Plaintiff Yasaman Rowhani was one of the "workers" whose withholdings were misappropriated.

108.    On August 25, 2011, DOL Defendant McKee interviewed Tina Seal, another former Hotel employee who came forward after she read the news of Plaintiffs' arrest.  DOL Defendant Seal had been a custodian at the Hotel who left on bad terms and was only too happy to accuse Plaintiffs of nefarious

motives and stealing her money.  Despite the fact that Ms. Seal had a criminal record for theft and that her "evidence" of Plaintiffs' alleged theft was that they drove nice cars, and that Plaintiff Yasaman Rowhani was a "bitch" who made her go outside and clean windows, DOL Defendant McKee was certain she had found her smoking gun.

109.    And, like every other employee who ever spoke with DOL Defendant McKee or testified in open court, Tina Seal could not say that Plaintiffs knew that employee withholdings were not being forwarded to the insurance coverage.  Ms. Seal also failed to mention that she was working only approximately 20 hours per week and was not eligible for insurance.  Although Ms. Seal and several other alleged "victims" were ineligible for insurance, they only stayed enrolled because of the fraudulent efforts of Abbie Rhodes.

110.    On September 15, 2011, Plaintiffs' criminal defense attorney met with Defendant Michael and DOL Defendant McKee.  Defendant Michael threatened Plaintiffs with 15 years in jail and demanded they plead guilty.  Upon information and belief, Defendant Michael has a reputation for always seeking maximum sentences in criminal cases no matter how minor the offense or how mitigating the circumstances.  Despite the very real threat that Defendant Michael would be able to secure a conviction in Hagerstown against Plaintiffs because they were of Iranian descent even with no evidence of criminal activity, Plaintiffs flatly refused to plead guilty to a crime they did not commit.

111.    On February 1, 2012, DOL Defendant McKee finally took steps to locate Farhad Jaberi, a key witness who was a former general manager of the Hotel during the period in question and who worked directly with Abbie Rhodes.  In fact, on every official document regarding the insurance in 2009, it was either Ms. Rhodes or Mr. Jaberi who signed on behalf of the Hotel.  Upon information and belief, DOL Defendant McKee, despite knowing the importance of this potential witness, never made any effort to

even locate Mr. Jaberi's whereabouts prior to February 2012, and even then did not attempt to contact him.

112.     From April 30 through May 3, 2012, a jury trial was held before Judge Daniel P. Dwyer in the Circuit Court for Washington County, Maryland.  Defendant Michael prosecuted the case, calling over ten former Hotel employees, as well as a representative from Kelly & Associates, a representative from Guests, Inc., the insurance broker Ed Lough, and DOL Defendant McKee.

113.     The trial quickly disintegrated into a laughing stock for the prosecution.  Defendant Michael questioned the former employees, obviously never having spoken before with them and having little idea of what they would say on the stand.  None of the former employees testified that either Plaintiff knew that Abbie Rhodes had not been forwarding employee withholdings towards the insurance payments. Moreover, most of them testified that the information on their insurance enrollment forms were wrong. Most of them admitted that they were part-time employees ineligible for insurance during the time period in which the alleged thefts were taking place.

114.     None of the witnesses testified that Plaintiffs were the owners of the Hotel despite Defendant Michael's best efforts to get them to speculate.  Also, none of the witnesses testified as to when Plaintiffs first learned that withholdings were not being forwarded to insurance.

115.     Even Ed Lough, the insurance broker who went out of his way to brag about the service he provided to the Hotel, could not say that he even spoke with either Plaintiff prior to June 2009 about the insurance arrearage.  This lack of testimony was despite the fact that he met with Plaintiff Yasaman Rowhani in March to discuss renewing the insurance coverage for the Hotel.  Mr. Lough testified that he thought the insurance was paid at the time.  In fact, he was often unclear on how much the Hotel was supposed to pay because of discrepancies between CareFirst and Kelly & Associates in their billing, and

that in late March 2009, he complained to Kelly & Associates that he "was losing credibility" with the Hotel because he never knew how much it owed.

116.     Mr. Lough also testified that his primary point of contact for insurance matters always had been Abbie Rhodes, the Hotel's comptroller and Farhad Jaberi, the general manager.

117.     DOL Defendant McKee also testified very briefly to say that the DOL ESBA became involved with the Hotel's insurance lapse because of the complaint by former employee Patricia McDonnell.  DOL Defendant McKee did not testify that she and her fellow DOL Defendants had been singlehandedly responsible for the investigation and actively blocked a DOL civil investigation so as to ensure the arrests and criminal prosecution of Plaintiffs with no evidence of wrongdoing.   DOL Defendant McKee did not testify to the fact that during the course of her investigation she made no reasonable effort to contact Bahman Rowhani, the sole shareholder of Watchwood, the owner of the Hotel, or Plaintiffs prior to having them arrested.  She did not testify to the fact that her actions went against the policies and procedures of the DOL ESBA for securing restitution for employees who lost benefits.  She also did not testify to the fact that she coached Abbie Rhodes' testimony to say exactly what Defendant Michael wanted her to say before he would agree to prosecute.

118.     Defendant Michael also put on a witness from Guests, Inc. who could only testify that when her company managed the Hotel it was Abbie Rhodes who gave her instructions for paying the insurance premiums each month.  Defendant Michael questioned another witness from Kelly & Associates who likewise testified that her contact at the Hotel was Abbie Rhodes.  Neither witness could testify as to even speaking with Plaintiffs regarding the Hotel's insurance.

119.     Abbie Rhodes testified on the penultimate day of the trial.  She admitted that she had been granted immunity in exchange for her testimony.  Even so, she could not offer any evidence that either Plaintiff

was aware that she continued to take withholdings from Hotel employees without forwarding them to the

insurance company.  She even admitted that she never even spoke to Plaintiff Yasaman Rowhani about the

insurance until Plaintiff Yasaman Rowhani confronted Ms. Rhodes in July 2009, asking why Ms. Rhodes

continued withholdings after it became obvious there would not be enough money for the Hotel to save

the insurance.

120.    Most damningly, Ms. Rhodes further testified how important this insurance was to her and her

family, and admitted that she herself did not advise anyone, including Plaintiffs, to stop the withholding

because she needed to keep the insurance coverage for her family, and was afraid Hotel management,

including Plaintiffs, would cancel it if she brought the full scope of the problem to their attention.

121.    By the close of the prosecution's case, it was clear to everyone in the courtroom that the charges

against Plaintiffs were a complete farce.  The charges against Plaintiffs were the product of malicious and

reckless investigative work.  All parties involved in the investigation, including all DOL Defendants and

the named Defendant in the Maryland State's Prosecutor's Office for Washington County, exhibited a

blatant, reckless and malicious disregard for Plaintiffs' rights as U.S. citizens.  Defendants knew that Ms.

Rhodes was in full control and had full knowledge with regards to all financial matters related to the

insurance premiums, but they did not want to prosecute a white female employee, but chose two

employees of Iranian descent who were more attractive targets.  This disregard was perpetrated because of

each Defendant's individual and personal desire to advance their careers with what they thought would be

a simple, easy and newsworthy conviction of Iranian interlopers for stealing money from hardworking

local Hagerstown employees.  Defendants had no evidence, and despite this lack of evidence, knowingly

took steps to indict, arrest, and prosecute Plaintiffs.  This despicable act not only showed a complete lack

of respect for the rights of Plaintiffs, but also a complete lack of respect for the judicial system in

Washington County, including the judge and jury.  All Defendants were confident they could get a conviction in Washington County without evidence, simply because Plaintiffs are of Iranian descent and outsiders.

122.    Fortunately for Plaintiffs, their trial in Washington County was conducted before Judge Dwyer, who did not share the same indifference for Plaintiffs' civil rights.  Judge Dwyer would not let the trial proceed without evidence against them.  On Friday, May 4, 2012, at the close of the prosecution's case, Judge Dwyer ordered the charges dismissed per a motion for judgment of acquittal.  In so ordering, the Judge held "I cannot find that the State has proven, or has established, even in a light most favorable to them, that there was ever an intent to commit theft [by Mr. Mohammadi and Ms. Rowhani]."  Transcript of Judge Dwyer's In-Court Acquittal at 9:22-10:1.  The Court also found that there was no evidence presented by the State that Hassan Mohammadi or Yasaman Rowhani "pocketed the money", *i.e.*, the employee's withholdings, or "that they received any benefit from it."  *Id*. at 10:7-17.  The Judge acknowledged that his grant of an acquittal upon motion at the end of the State's case was "very unusual".  *Id*. at 2:4-5.

123.    None of the Defendants arranged press coverage of Plaintiffs' complete exoneration.  Not a single Defendant ever offered even a word of apology to Plaintiffs.  There has not been any press release from Defendants acknowledging that Plaintiffs were innocent and falsely accused.  Plaintiffs continue to suffer the shame, humiliation and trauma these false charges inflicted upon them and their family.  Defendants should not and cannot be allowed to escape liability for their malicious violation of Plaintiffs' constitutional rights, and their shameful betrayal of the public trust.  Defendants' actions are all the more reprehensible as they were done in a cynical attempt to advance each Defendant's personal career.

## CLAIMS FOR RELIEF

## COUNT I – VIOLATION OF PLAINTIFFS' RIGHTS
## UNDER ARTICLES IV and XIV OF THE UNITED STATES CONSTITUTION

124.    The allegations of paragraphs 1 through 125 are incorporated by reference as though restated and set forth in full herein.

125.    Defendants Cristina O'Brien, David Finizie and Colleen McKee, each in their personal capacity through their intentional, malicious and reckless acts performed under the color of federal law as agents of the DOL, caused Plaintiffs to be indicted, arrested and prosecuted under Maryland state law, knowing that there was no evidence against Plaintiffs to substantiate even probable cause.  All of these actions were done under the color of federal law.

126.    The DOL Defendants were motivated primarily by personal concern for their own professional advancement.

127.    The DOL Defendants targeted Plaintiffs in particular because of their national origin and their status as outsiders in Hagerstown, denying them their rights to equal protection under law under the Fourteenth Amendment.  Upon information and belief, the DOL had never before, or since attempted, state criminal prosecution for an employee benefits cases with such a small amount in controversy, and only pursued civil actions against white persons and companies with a similar fact pattern, even where the amount in controversy drastically exceeded the $9,000 in controversy in the present matter.  The DOL Defendants had no proper motive for singling out Plaintiffs from criminal prosecution in this manner.

128.    As a result of the DOL Defendants' conduct, Plaintiffs were unlawfully incarcerated and held as prisoners for seven days, violating their Fourth Amendment right to be free from illegal search and seizure.  Plaintiffs both suffered shame and humiliation.  Plaintiff Yasaman Rowhani had to be hospitalized due to the stress caused by her wrongful imprisonment.  Plaintiffs suffered, continue to suffer,

and will continue to suffer, severe emotional distress, anguish, and medical and other related expenses as a result of the DOL Defendants' unlawful conduct.

WHEREFORE, Plaintiffs Hassan Mohammadi and Yasaman Rowhani demand judgment against the DOL Defendants for violation of their rights under the Fourth and Fourteenth Amendment to the U.S. Constitution in the amount of two million dollars ($2,000,000.00) in compensatory damages, and two million dollars ($2,000,000.00) in punitive damages, with interests and the costs of prosecuting this action, including attorneys' fees.

**COUNT II – VIOLATIONS OF PLAINTIFFS'**
**CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

129.    The allegations of paragraphs 1 through 130 are incorporated by reference as though restated and set forth in full herein.

130.    Defendant Joseph Michael, in his personal capacity through his intentional, malicious and reckless acts performed under the color of state law as Deputy State's Attorneys for Washington County, Maryland, caused Plaintiffs to be indicted, arrested and prosecuted under Maryland state law, knowing that there was no evidence against Plaintiffs to substantiate even probable cause.  All of these actions were done under the color of state law.

131.    Defendant Michael was motivated solely by personal concern for their own professional advancement, and actual malice against Plaintiffs due to their national origin and status as outsiders to Hagerstown.  Defendant Michael refused to consider prosecution of a white person who demonstrated the only legitimate evidence of any wrongdoing.  Instead, Defendant Michael decided from the outset that Plaintiffs, who are of Iranian descent, were the only criminal targets they would consider and dictated to the DOL Defendants exactly what he wanted the white witness to say so they could prosecute Plaintiffs.

132.    Defendant Michael chose to prosecute Plaintiffs in particular because of their national origin and their status as outsiders in Hagerstown, denying Plaintiffs their rights to equal protection of the laws under the Fourteenth Amendment.

133.    As a result of Defendant's conduct, Plaintiffs were unlawfully incarcerated and held as prisoners for seven days, violating their Fourth Amendment right to be free from illegal search and seizure. Plaintiffs both suffered shame and humiliation.  Plaintiff Yasaman Rowhani had to be hospitalized due to the stress caused by her wrongful imprisonment.  Plaintiffs suffered, and will continue to suffer, severe emotional distress, anguish, and medical and other related expenses as a result of Defendant Michael's unlawful conduct.

WHEREFORE, Plaintiffs Hassan Mohammadi and Yasaman Rowhani demand judgment against Defendant Joseph Michael, for violation of their civil rights while acting under color of law in violation of 24 U.S.C. § 1983 in the amount of two million dollars ($2,000,000.00) in compensatory damages, and two million dollars ($2,000,000.00) in punitive damages, with interest and the costs of prosecuting this action, including attorneys' fees.

**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

Respectfully submitted this 12th day of November, 2014.

**DOYLE, BARLOW & MAZARD PLLC**

_____

**Rosemarie Salguero, Fed. Bar No. 19039**
**Andre Barlow, admitted *Pro Hac Vice***
**Keith Lively, admitted *Pro Hac Vice***
**1110 Vermont Ave., NW, Suite 715**
**Washington, DC 20005**
**Telephone: 202-589-1836**
**rsalguero@dbmlawgroup.com**
**abarlow@dbmlawgroup.com**
**klively@dbmlawgroup.com**

***ATTORNEYS FOR PLAINTIFFS***
***HASSAN MOHAMMADI and***
***YASAMAN ROWHANI***